### In re Clay County General Election

---

IN RE: APPEAL OF, AND PETITION FOR JUDICIAL REVIEW BY
REPUBLICAN CANDIDATES FOR ELECTION IN CLAY COUNTY,
NORTH CAROLINA, OF THE DECISIONS AND ORDERS OF THE NORTH
CAROLINA STATE BOARD OF ELECTIONS, IN RE: CLAY COUNTY:
GENERAL ELECTION, NOVEMBER 7, 1978 FOR COUNTY ELECTIVE OF-
FICES

No. 7910SC873

(Filed 18 March 1980)

1. **Elections § 7— authority of State Board to order new election on own motion**

Rules and regulations adopted by the State Board of Elections for the fil-
ing of protests do not afford the only means of inquiry into an election, and the
State Board had authority to declare a portion of a county's general elections
void and to order a new election for some of the offices on its own motion
without an election protest having been filed with it.

2. **Elections § 7— public hearing on election irregularities—sufficiency of notice**

Notice published in a newspaper and provided to each member of the
county board of elections and each candidate whose name appeared on the
ballot for a county office that a public hearing would be held at a specified
time and place to inquire into the processes relative to a general election con-
ducted in the county, particularly the processes involving absentee ballots, was
sufficient to comply with due process, it not being necessary for the State
Board of Elections to particularize any charges in the notice of public hearing.

3. **Elections § 7— public hearing on election irregularities—cross-examination of
witnesses**

The State Board of Elections did not err in denying petitioners the right
to cross-examine sworn witnesses who testified at a public hearing held to in-
quire into alleged irregularities in a general election in Clay County where the
chairman clearly indicated that if the preliminary proceedings before the State
Board were such as to require further proceedings, any petitioner would have
the right to recall any witness for cross-examination; two witnesses were
thereafter recalled and made available for cross-examination; and petitioners
did not ask that any witness not recalled be recalled and made available to
them for cross-examination.

4. **Elections § 7— State Board's order of new election—procedures—findings of
fact**

A decision of the State Board of Elections ordering a new election for cer-
tain offices in Clay County was not made on "unlawful procedures" without
findings of fact where the chairman orally announced the board's decision on 6
December 1978 to order a new election because of irregularities in assistance
rendered to persons who voted by absentee ballots and in the collection and
return of voted absentee ballots; a written decision was filed on the same day
incorporating the oral decision; an order was entered 14 December 1978 set-
ting a date for the new election and setting out the rules and procedures for

In re Clay County General Election

its conduct; and on 13 February 1979 the State Board filed a written order containing its findings of fact and conclusions of law.

5. **Elections § 10— irregularities in absentee ballots—order for new elections— sufficiency of evidence to support findings**

The evidence in the record as a whole supported findings made by the State Board of Elections in its order requiring a new election for certain public offices in Clay County because of irregularities in assistance rendered to absentee voters; irregularities in the issuance, collection and return of voted absentee ballots; the voting by absentee ballot of persons who were ineligible to vote; and the payment of money to voters to mark their absentee ballots in a certain way.

6. **Elections § 10— irregularities in absentee ballots—order for new election—absence of finding that irregularities affected election results**

The State Board of Elections had authority under G.S. 163-22.1 to order a new election for certain public offices in Clay County because of numerous irregularities connected with absentee ballots in the past general election without finding that such irregularities affected the outcome of the past election.

APPEAL by petitioners from *Bailey, Judge.* Order entered 2 May 1979, Superior Court, WAKE County. Heard in the Court of Appeals 26 November 1979.

Petitioners are Republicans who received, in the general election conducted in Clay County on 7 November 1978, a sufficient number of the votes cast to denominate them as winners for the offices of Clerk of Superior Court, Register of Deeds, Sheriff, members of the Board of County Commissioners, and members of the County Board of Education. On 10 November 1978, as the result of complaints received, the State Board of Elections issued a notice that it would, on 4 December 1978, hold a public hearing and inquire "into the processes relative to the general election conducted in Clay County on Tuesday, November 7, 1978 as well as all attendant procedures preliminary to the conduct of said election, including but not limited to the conduct of elections officials, candidates and other citizens resident within and outside of Clay County." The notice further stated that "[t]he processes involved in applying for, receiving and returning absentee ballots shall be a critical concern of the public inquiry." Further, the notice advised that following the hearing the State Board of Elections would determine whether a new election for county offices in Clay County would be ordered.

The hearing was had at the time indicated in the notice. At the conclusion of the public hearing at approximately one o'clock a.m., 6 December 1978, the State Board of Elections, by unanimous vote of the four members attending announced that because of the numerous irregularities which had occurred attendant to the general election, a new election would be called for the offices of Clerk of Superior Court, Register of Deeds, Sheriff, members of the Board of County Commissioners, and members of the County Board of Education. By order of the State Board of Elections entered 14 December 1978, a new election was scheduled for 6 March 1979. Petitioners filed notice of appeal, and the order for a new election was stayed, pending judicial determination of the legality of the Board's action.

On review by the Superior Court, the Court affirmed the State Board. Petitioners appealed from the order entered, and the stay of the order calling a new election was continued pending appellate review.

Facts necessary for decision are set out in the opinion below.

*Attorney General Edmisten, by James Wallace, Jr., Deputy Attorney General for Legal Affairs, for the State Board of Elections, appellee.*

*Long, McClure, Parker, Hunt & Trull, by Robert B. Long, Jr., for petitioner appellants.*

MORRIS, Chief Judge.

[1] Petitioners first contend that the State Board of Elections was without jurisdiction and authority to declare portions of the Clay County General Election void and order a new election for some of the offices on its own motion without an election contest having been filed with it. The record does not indicate that any challenge or complaint had been lodged with the County Board of Elections pursuant to the provisions of 8 N.C.A.C. 2 *et seq.*, and we assume that none had been. It is clear from the record that the hearing was had on the State Board's own motion. The notice provided that the Board was directing the conduct of a public inquiry "pursuant to authority contained in G.S. 163-22(d) and upon its own motion."

G.S. 163-22(d) provides:

The State Board of Elections shall investigate when necessary or advisable, the administration of election laws, frauds and irregularities in elections in any county and municipality and special district, and shall report violations of the election laws to the Attorney General or solicitor or prosecutor of the district for further investigation and prosecution.

That the authority of the State Board to conduct the public inquiry and enter an order calling for a new election was not dependent upon a protest having been previously filed was made quite clear by this Court in *Sharpley v. Board of Elections*, 23 N.C. App. 650, 209 S.E. 2d 513 (1974), where we said:

In our opinion, and we so hold, the authority of the State Board to conduct the investigation and to enter the order in this case was not dependent upon the filing of a timely protest. *The mandatory tone of the statute which directs that the Board "shall investigate when necessary or advisable . . . frauds and irregularities in elections," makes clear that the Board in appropriate circumstances may take action on its own motion even in the absence of any protest. A fortiori* the Board may in its discretion consider and act upon a protest, even though such protest may not have been filed within the time period prescribed by the Board's own rules. By adopting those rules the Board did not, and could not, inhibit or curtail the performance by it of duties otherwise expressly imposed upon it by statute. That this is so is further borne out by the directive in G.S. 163-22(c) that the State Board "*shall* compel observance of the requirements of the election laws by county and municipal boards of elections and other election officers," and that "[i]n performing these duties, the Board *shall* have the right to hear and act on complaints arising by petition *or otherwise. . . .*" (Emphasis added.)

23 N.C. App. at 651-52, 209 S.E. 2d at 514-15. Petitioners' position that the adoption by the State Board of its own rules and regulations for the filing of protests (see 8 N.C.A.C. 2 *et seq.*) affords the *only* means of inquiry into an election is clearly without merit. The Legislature has mandated that the State Board of

Elections shall compel observance of the election laws. To do so, the State Board of Elections must have authority to hear and act on complaints, whether they arise by petitions filed in accordance with the rules and regulations promulgated by the Board *or otherwise.* We reiterate what we said in *Sharpley.* This assignment of error is overruled.

[2] By the next assignment of error petitioners challenge the sufficiency of the notice given by the State Board of the public hearing. They urge that the State Board, by failing strictly to comply with the notice requirements of G.S. 150A-23, failed to satisfy the constitutional requirement of reasonable notice of charges in order to satisfy due process requirements for a fair hearing. While we are of the opinion that the procedure contemplated by G.S. 163-22(d) is not the type of procedure contemplated by Article 3 of the Administrative Procedure Act, there can be no doubt but that petitioners were entitled to notice. G.S. 150A-23 requires that the "parties in a contested case" shall be given "a reasonable notice of the hearing." The notice published by the State Board provided for "a public hearing and inquiry into the processes relative to the general election conducted in Clay County on Tuesday, November 7, 1978, as well as all attendant procedures preliminary to the conduct of said election, including but not limited to the conduct of election officials, candidates and other citizens resident within and outside of Clay County. The processes involved in applying for, receiving and returning absentee ballots shall be a critical concern of the public inquiry." The chairman of the Clay County Board of Elections was directed to have the notice published in a newspaper having general circulation in Clay County at least twice before the date scheduled for the hearing. The chairman was further directed to provide a copy of the notice to all members of the Clay County Board of Elections and to each candidate whose name appeared on the ballot in Clay County for a county office. All citizens were advised that any person who had information which might have a bearing on the inquiry would be afforded the opportunity to be heard. The time and place of the hearing was set for ten o'clock a.m. on 4 December 1978 at the courtroom of the Clay County courthouse in Hayesville. Appellants do not contend that they did not receive the notice. They contend that they were not adequately advised of the charges. This is where appellants' argument

fails. The notice simply notified the public generally, the County Board of Elections, and each candidate for. county office whose name was on the ballot that an inquiry had been launched into the conduct of the election and particularly the processes involving absentee ballots. There was no action against any specific candidate. There were no specific charges against any candidate. The action of the State Board in calling for the inquiry in no way constituted an action against anybody. There were no "parties to a contested case" as is contemplated by G.S. 150A-23. The purpose of the public hearing and inquiry was clearly stated. No more particularity than was given was required. To require the State Board to particularize in the notice and limit the inquiry and public hearing to those particulars obviously could militate against the very purpose of a public hearing. The notice was sufficient, and this assignment of error is overruled.

[3] Appellants next assign as error the alleged denial of cross-examination of some of the witnesses whose testimony was considered by the Board in arriving at its findings of fact and conclusions of law. At the beginning of the hearing, the chairman announced that the hearing would "take a two-fold nature." First, the Board would, by examining witnesses whose testimony would be sworn testimony, inquire into such matters as it deemed pertinent. For that portion of the inquiry, there would be no right of cross-examination, unless evidence of criminal conduct on the part of specific individual petitioners was elicited, in which event petitioners' counsel would be allowed to cross-examine. At the conclusion of that inquiry the Board would retire into executive session for the purpose of determining whether "it should proceed further on the question of whether or not [sic] new elections should be ordered in any office in Clay County for county offices." The denial of cross-examination at this stage was, according to appellants, unlawful and unconstitutional. We do not agree. The chairman clearly indicated that if the preliminary proceedings were such as to require further proceedings, any petitioner would have the right to recall any witness for cross-examination. Indeed, at least two witnesses were recalled and made available for cross-examination. Though petitioners were so advised, they did not ask that any witness not recalled be recalled and made available to them for cross-examination. Additionally, as will be pointed out *infra*, the order of the State Board calling for a new election is

amply supported by the evidence even if the testimony of the witnesses who were not recalled were stricken. This assignment of error is without merit.

[4] Appellants next contend that the decision of the State Board was made on unlawful procedures. After the conclusion of the testimony at the hearing, the Board retired into executive session. After consideration of the testimony in executive session, the Board entered an "oral order" in which it concluded "that assistance permitted to voters voting one-stop absentee ballots, as well as the collection of and return of voted absentee ballots, does not satisfy the most elemental requirements of the statutes" and, upon affirmative vote of the four members of the Board present, ordered a new election for the offices of Clerk of Superior Court, Sheriff, members of the Board of County Commissioners, and members of the County Board of Education. This was done on 6 December 1978 by the chairman orally to the assemblage. On the same day, a written decision was filed incorporating the oral decision.

On 14 December 1978, an order was entered setting a date for the new election and setting out rules and procedures for its conduct. On 5 February 1979, this order was stayed. On 13 February 1979, the State Board filed a written order containing its findings of fact and conclusions of law.

Appellants urge that the initial written "decision" and the second written order setting the time for the new election both were without findings of fact, and jt wasn't until 13 February 1979 that an order was entered which contained findings of fact. Appellants do not advance any reason for their position except that this is a substantial departure from G.S. 150A-36, which requires findings of fact. We fail to see any "unlawful procedure". Nor do we find any prejudice resulting to appellants. This assignment of error is totally without merit.

[5] Appellants contend that the "findings of fact, conclusions of law and order of the North Carolina State Board of Elections were not supported by competent, substantial, and material evidence upon the whole record as submitted."

The Board made the following findings of fact:

1. That preceding the general election on November 7, 1978, at least 32 absentee ballots of specified voters in Clay County were irregularly and illegally returned to the Supervisor of Elections for the Clay County Board of Elections. That ballots cast by other voters were in the possession of candidates for public elective offices contrary to specific procedures mandated in Article 20, Chapter 163 of the General Statutes of North Carolina wherein it is required that executed absentee ballots shall be returned to the Chairman of the appropriate Board of Elections by U.S. Mail at the voter's expense, by the voter in (illegible) or by a near relative of the voter. Further,

(a) That at least the aforementioned 32 absentee ballots were collected in the office of the Clerk of Superior Court by the Supervisor of Elections (Ms. Diane Maney Lambert) immediately prior to the deadline for the return of absentee ballots, and she delivered them to the Office of County Board of Elections without revealing to the Chairman how she had come into possession of them; that she later represented to the Chairman of the Board of Elections that the ballots were received from the voters in person, when she in fact knew the ballots were received by her from the possession of candidates for office;

(b) That Sheriff Hartsell Moore, candidate for Clerk of Superior Court; Chairman Howard Wimpy, candidate for the Clay County Board of Commissioners, and Jerry Lowe, an employee of the Clay County Tax Office, individually, or acting in concert, illegally received, collected and held the executed ballots of at least 32 voters of Clay County and collectively presented the aforementioned absentee ballots to the Supervisor of Elections shortly before the absentee ballot return deadline on November 6, 1978; and that the aforementioned persons, acting in concert, succeeded in accomplishing the illegal delivery of at least 32 executed absentee ballots to the Office of the Clay County Board of Elections, all of which ballots were counted in the November 7, 1978 General Election;

(c) That said 32 absentee ballots were sealed with cellophane tape by someone other than the voters who ex-

ecuted them and, except for those ballots held in the Sheriff's possession, how those ballots became taped, or why they were taped, could not be determined by the State Board of Elections from the testimony before it;

(d) That the portion of the 32 ballots illegally collected and retained by the Clerk of Superior Court were stored in the vault of the said Clerk; personnel in that office and anyone on business in, or visiting, said office had free and easy access to the ballots during the period of their retention and before their delivery to the Supervisor of Elections on November 6, 1978;

(e) That all 32 of the absentee ballots in question were counted and included in the final calculation of votes, due, at least in part, to the fact that the Supervisor of Elections never revealed to the Chairman or any member of the County Board of Elections the fact that she had received the ballots in the office of the Clerk from candidates for office in the general election; that she represented to the Chairman that she received them from the voters, and admitted, during the hearing before the State Board of Elections, that she lied in order to have the absentee ballots counted;

2. That Robert G. Carlan, a convicted felon whose citizenship has not been restored and who presently is on parole voted an absentee ballot (# 36) in the November 7, 1978 General Election; Carlan is a former employee of Candidate Hoby Garrett;

3. That Denise Ledford, a convicted felon whose citizenship has not been restored and who presently is on parole voted an absentee ballot (# 361) in the November 7, 1978, General Election;

4. That Mike F. Carlan, a minor whose date of birth was incorrectly given by him to be April 6, 1960, voted an absentee ballot (# 6) in the November 7, 1978, General Election, contrary to law; that he was not eligible to register or vote;

5. That Morris Junior Spivey, a minor whose date of birth was incorrectly given by him as March 5, 1960, voted an absentee ballot (# 126) in the November 7, 1978, General Elec-

tion, contrary to law; that he was not eligible to register or vote;

6. That Sandra Ruth Lyons voted an absentee ballot (# 54) in the November 7, 1978, General Election, and was paid $30.00 by Robert Carlan to so do and to vote a straight Republican ballot; that she, being under no legally recognized disability, and without making a request for assistance, was illegally assisted in marking her ballot in the office of the Board of Elections by Hoby Garrett, Republican candidate for County Board of Education;

7. That Lawanda Cope voted an absentee ballot (# 53) in the November 7, 1978, General Election, and was paid $30.00 by Robert Carlan to do so and to vote a straight Republican ballot; that she, being under no legally recognized disability, and without making a request for assistance, was illegally assisted in marking her ballot in the Office of the Board of Elections by Hoby Garrett, Republican candidate for County Board of Education;

8. That Mary Elizabeth Wilson voted an absentee ballot (# 55) in the November 7, 1978, General Election and was paid $30.00 by Robert Carlan to do so and to vote a straight Republican ballot; that she, being under no legally recognized disability, and without making a request for assistance, was illegally assisted in marking her ballot in the office of the Board of Elections by Hoby Garrett, Republican candidate for County Board of Education;

9. That Ida Lloyd voted an absentee ballot (# 73) and was illegally paid $15.00 by Sam Morris to vote a straight Republican ticket;

10. That Jimmy Lloyd voted an absentee ballot (# 12) and was illegally paid $10.00 by Sam Morris to vote a straight Republican ticket;

11. That Milie Lloyd voted an absentee ballot (# 13) and was illegally paid $10.00 by Sam Morris to vote a straight Republican ticket;

12. That all absentee ballots cast in the November 7, 1978, General Election were issued contrary to G.S. Sec.

163-229, wherein it is required that the Chairman or member of the County Board of Elections certify that the applicant is a registered and qualified voter and that the voter's application was properly made. That the certifications on all such absentee return envelopes were executed by the Supervisor of Elections who had not been authorized by the County Board of Elections to execute the certifications thereon;

13. That a total of 366 civilian absentee ballots were issued for the November 7, 1978, General Election, of which 267 were "one-stop" voters and 99 were mailed to the voter. Only 23 ballots were transmitted and received by the County Board of Elections in the U.S. Mail; 6 military absentee ballots were issued;

14. That on numerous occasions candidates checked the Register of Absentee Applications in the Office of the Clay County Board of Elections to ascertain to whom ballots had been issued and subsequently paid visits to many of those applicants in their home; candidates assisted voters in their homes, illegally took executed absentee ballots into their possession, representing to the voters that the ballots would be mailed or delivered to the County Board of Elections, and illegally assisted an undetermined number of "one-stop" absentee ballot voters in the Office of the Clay County Board of Elections after having transported, in some cases, those voters to the Office of the Board;

15. That Ralph Allison, the Clerk of Superior Court and a candidate for re-election, systematically took acknowledgments and used his official seal of office on absentee ballot envelopes;

16. That the Supervisor of Elections forged the name of the Chairman of the Clay County Board of Elections to the "receipt for ballots" issued by the State Board of Elections; that the Supervisor of Elections stored ballots in an often unlocked and unattended vault in the Office of the Register of Deeds, a candidate for re-election, without receiving instructions or permission from the Chairman of the County Board of Elections; and that numerous unauthorized persons, including candidates for election and re-election, had access to said ballots; and that the Supervisor of Elections, without

instructions or permission from the Chairman of the County Board of Elections, and without authority otherwise, removed a number of ballots from said vault and issued them as absentee ballots;

17. That the State Board of Elections, after learning that official ballots, unsealed, had been stored in the office of the said Register of Deeds, a candidate for re-election, and in an attempt to ensure the purity of the November 7, 1978, General Election in Clay County, ordered the removal of said ballots to the vault of a local bank to remain in the custody of the Chairman of the County Board of Elections; that the State Board further directed that the county ballots be reprinted in an effort to ensure the purity of the November 7, 1978, General Election;

18. That an agent of the State Bureau of Investigation, assigned to Clay County at the request of the State Board of Elections, observed Hoby Garrett, a candidate for Board of Education, improperly assist 10 absentee ballot voters on one occasion and 6 absentee ballot voters on a separate occasion in the Office of the County Board of Elections;

19. That, on numerous occasions, absentee "one-stop" voting" took place on the desk of the Supervisor of Elections rather than inside the voting booth, contrary to the provisions of G.S. Sec. 163-273;

20. That Lexie Henderson, a critically ill cancer patient was carried to the Courthouse in the truck of Ralph Allison, a candidate for Clerk of Superior Court, in the rain, and an absentee ballot was obtained from the Supervisor of Elections, taken to the voter in the truck, where no election official was present, and returned to the Supervisor of Elections, by the candidate;

21. That on no occasion in the 60 days before the November 7, 1978, General Election did the Supervisor of Elections attempt to determine whether "one-stop" voters of absentee ballots were legally eligible to receive the assistance in voting which they requested; assistance from and to anyone was routinely allowed upon request, resulting is assistance, including the marking of ballots, being given to

voters by candidates and noncandidates alike; that the Supervisor of Elections, either through ignorance or design, failed otherwise to properly supervise the "one-stop" voting which took place in the Office of the Board of Elections.

22. That nearly all of the envelopes containing absentee ballots counted in the November 7, 1978, General Election had been sealed with tape of various origins by persons other than the voters; that the practice of taping closed the envelopes containing absentee ballots by persons other than the voters of those ballots, although the testimony was that said practice was to prevent fraudulent tampering with those ballots, compels the State Board of Elections to recognize the inference that said practice could facilitate, and serve to conceal, fraudulent tampering.

23. That, as a result of the facts hereinbefore found to be true, the voters of Clay County were denied the opportunity to participate in a free and fair election on November 7, 1978, the purity and validity of said election being suspect and doubtful.

Upon those findings of fact the Board made the following conclusions of law:

1. The State Board of Elections has general supervision over primaries and elections in the State, with authority to promulgate legally consistent rules and regulations for their conduct and to compel the observance of the election laws by county boards of elections; and the duty of the State Board to canvass the returns and declare the results of an election in a county does not affect its supervisory power, which perforce must be exercised prior to the final acceptance of the returns made by the county boards. *BURGIN v N. C. STATE BOARD OF ELECTIONS*, 214 N.C. 140, 198 SE 592 (1938); NCGS Sec. 163-22;

2. The State Board of Elections has the power to supervise primaries and general elections to the end that, insofar as possible, the results in primary and general elections in the State will not be influenced or tainted with fraud, corruption or other illegal conduct on the part of election officials or others. *PONDER v JOSLIN*, 262 NC 496, 138 SE 2d 143 (1964); NCGS Sec. 163-22;

3. The State Board of Elections is not limited in its authority to merely investigate alleged frauds and irregularities in elections for the sole purpose of making a report of the same to the Attorney General or District Attorney for further investigation or prosecution, but is empowered as well to determine that discovered fraud and irregularities militate against the propriety of certifying election results and to order new elections or to take such other action as its findings of fact may justify. *PONDER v JOSLIN*, supra; NCGS Sec. 163-22.1;

4. The Findings of Fact hereinabove set forth reflect numerous irregularities in the conduct of the November 7, 1978, General Election in Clay County, and reveal that those irregularities could have been substantially and significantly associated with the perpetration of fraud and corruption in said election;

5. That, as a result of the facts hereinbefore found to be true, the voters of Clay County were denied the opportunity to participate in a free and fair election on November 7, 1978, the purity and validity of said election being suspect and doubtful.

6. That the occurrence of such a large number of irregularities, in itself, and absent the direct proof of any willful wrongdoing, is sufficient to warrant and justify the refusal of the State Board of Elections to permit certification of the results of the November 7, 1978, General Election in Clay County and to order a new election for any or all of the offices in contest on that date. *SHARPLEY v STATE BOARD OF ELECTIONS*, 23 NC App. 650, 209 SE 2d 513 (1974).

In order to give appellants' contention the consideration which every such contention deserves, we have studied carefully the testimony given at the hearing. We think it would serve no useful purpose to take each finding of fact and recapitulate the evidence which supports it. Suffice it to say that an examination of the evidence leaves no doubt but that each finding of fact is supported by competent evidence.

[6]   Finally appellants argue that the State Board of Elections is without authority to order a new election without a showing that

the results of the election were affected by the act complained of. It is true that there are no findings of fact upon which a conclusion could be based that the irregularities in absentee ballots could or did affect the outcome of the election. It is also true that our Supreme Court has held that generally an election will not be disturbed because of irregularities absent a showing that the irregularities are sufficient to alter the result. *Gardner v. City of Reidsville*, 269 N.C. 581, 153 S.E. 2d 139 (1967); *Watkins v. City of Wilson*, 255 N.C. 510, 121 S.E. 2d 861 (1961), *appeal dismissed and cert. denied*, 370 U.S. 46, 8 L.Ed. 2d 398, 82 S.Ct. 1166 (1962). *See generally*, 26 Am. Jur. 2d *Elections* § 342 (1966).

G.S. 163-22.1 enacted in 1973 provides:

If the State Board of Elections, acting upon the agreement of at least four of its members, and after holding public hearings on election contests, alleged election irregularities or fraud, or violations of elections laws, determines that a new primary, general or special election should be held, the Board may order that a new primary, general or special election be held, either statewide, or in any counties, electoral districts, special districts, or municipalities over whose elections it has jurisdiction.

Any new primary, general or special election so ordered shall be conducted under applicable constitutional and statutory authority and shall be supervised by the State Board of Elections and conducted by the appropriate elections officials.

The State Board of Elections has authority to adopt rules and regulations and to issue orders to carry out its authority under this section.

*Gardner v. City of Reidsville, supra*, and *Watkins v. City of Wilson, supra*, both involve the situation where an unsuccessful candidate seeks to invalidate an election. Clearly, if an unsuccessful candidate seeks to invalidate an election, he must be able to show that he would have been successful had the irregularities not occurred. *See also Owens v. Chaplin*, 228 N.C. 705, 47 S.E. 2d 12, *rehearing denied*, 229 N.C. 797, 48 S.E. 2d 37 (1948). We find no case in this State in which the State Board of Elections is the moving party which requires a showing that the result of the election would be altered. None of the decided cases in this State

was decided contrary to a determination by the State Board of Elections that irregularities in the conduct of an election were such that a cloud is cast upon the election.

Two cases from other jurisdictions are helpful.

In *Tebbe v. Smith*, 108 Cal. 101, 41 P. 454 (1895), the Court ordered the rejection of the votes of an entire precinct. Among other violations, the polls did not open until ten o'clock, closed for lunch, and the election officials took the ballot box with them to lunch, leaving unmarked ballots in the polling place. There was no showing that there would have been a difference in the result had these things not occurred. The Court stated the general rule that "mandatory provisions for the holding of an election must be followed, or the failure will vitiate it, while a departure from the terms of a directory provision will not render it void in the absence of a further showing that the result of the election has been changed, or the rights of the voters injuriously affected thereby. (Citations omitted.) But the rule as to directory provisions applies only to minor and unsubstantial departures thereform. There may be such radical omissions and failures to comply with the essential terms of a directory provision as will lead to the conclusive presumption that the injury must have followed." 108 Cal. at 111, 41 P. at 457. The Court said further that the courts have a duty to so adhere to the substantial requirements of the election laws as to preserve elections from abuses which are subversive of the rights of the voters. "And, under this view, the question becomes a broader one than can be disposed of by answering that in the individual case no harm resulted." 108 Cal. at 112, 41 P. at 457. In that case the Court concluded:

> In this case we are quite willing to believe that the misconduct of the officers of Lake precinct was prompted by nothing worse than ignorance, and lack of appreciation of the responsibilities of their positions, and we may say, further,—for such is the evidence,—that no harm is shown to have resulted from their conduct; but, looking to the purity of elections and integrity of the ballot box, we are constrained to hold that conduct like this amounts, in itself, to such a failure to observe the substantial requirements of the law as must invalidate the election. *Id.*

In re Clay County General Election

Much later, the *Tebbe* case was cited and quoted with approval by Justice Christianson, writing for a unanimous court, in *In re Contest of Election of Vetsch*, 245 Minn. 229, 71 N.W. 2d 652 (1955). There the contestant was able to prove numerous violations of election laws but could not show that any one violation or all cumulatively would affect the result. In invalidating the election, the Court said:

> It has long been the policy of this state that "in the absence of fraud or bad faith or constitutional violation, an election which has resulted in a fair and free expression of the will of the legal voters upon the merits will not be invalidated because of a departure from the statutory regulations governing the conduct of the election except in those cases where the legislature has clearly and unequivocally expressed an intent that a specific statutory provision is an essential jurisdictional prerequisite and that a departure therefrom shall have the drastic consequence of invalidity." This policy rests upon the sound principle that no person should be deprived of his right to vote because of the neglect or carelessness of election officials, unless the carelessness or irresponsibility has been carried to such an extent as to affect the true outcome of the election or put the results in doubt. In pursuit of this policy it has been generally held that after an election is over, statutory regulations are usually construed to be directory rather than mandatory unless the departure from the statutes casts uncertainty upon the result.

> Although admittedly no fraud has been shown in the present contest, there is no necessity of proving actual fraud in all cases. It is sufficient if there has been such a wholesale violation of the election laws, even be they only directory, that so great an opportunity for fraud exists as to impeach the integrity of the ballot.

> . . .

> In our opinion there has been such a substantial failure to comply with the law in the instant case. The election laws were violated from the very start of the election in La Crescent village. And in addition the violations were numerous, viz., improper appointment of the election board; improper

handling of ballots by the village clerk; unauthorized issuance of absentee ballots; failure to take, administer, and indicate proper oaths; unauthorized and ineligible persons filling in as judges and clerks without indication thereof; the intermixing of clerk and judge functions; failure to count ballots before issuing receipts therefor; and inadequate maintenance of the election register. The people conducting the election appeared to be completely unaware of the laws governing elections, and what is more, they made no effort whatsoever to become acquainted with them.

245 Minn. at 238-239, 71 N.W. 2d at 658-59. While in the case before us, there is no showing that the violations contained in the findings of fact were sufficient to change the outcome of the election, certainly a cloud of suspicion has been cast on *all* the absentee ballots cast in the election. Every voter is entitled to place confidence in the election system. Every voter is entitled to assume that every other vote is cast legally. He is entitled to have his vote counted honestly and fairly along with other votes which have been cast honestly and counted honestly and fairly. Anything less is a threat to the democratic system which is wholly dependent upon elections conducted fairly and honestly.

The people are entitled to have their elections conducted honestly and in accordance with the requirements of the law. To require less would result in a mockery of the democratic processes for nominating and electing public officials.

*Ponder v. Joslin*, 262 N.C. 496, 500, 138 S.E. 2d 143, 147 (1964).

The identical point of view was expressed with outstanding clarity by Chief Justice Andrews of the Court of Appeals of New York when he said:

We can conceive of no principle which permits the disfranchisement of innocent voters for the mistake, or even the willful misconduct, of election officials in performing the duty cast upon them. The object of elections is to ascertain the popular will, and not to thwart it. The object of election laws is to secure the rights of duly-qualified electors, and not to defeat them.

*People v. Wood*, 148 N.Y. 142, 146-47, 42 N.E. 536 (1895).

We think the violations of election procedures in the Clay County election of 7 November 1978 are more than sufficient to justify the State Board of Elections, acting pursuant to the broad provisions of G.S. 163-22.1, to call a new election for the county offices affected. Indeed, in our opinion, the State Board would have been derelict in its duty had it failed to call a new election. The order of the Superior Court affirming the order of the State Board of Elections is

Affirmed.

Judges PARKER and WELLS concur.