M. Janice **AYERS–SCHAFFNER, Shirley A. Chapian, and Robbin Shackleton, on behalf of themselves and the class of all others similar situated, Plaintiffs,**

v.

**Joseph DiSTEFANO, Jonathan K. Farnum, Louise Mauran, and William P. Shields, in their capacities as members of the Rhode Island Board of Elections, Defendants.**

**Civ. A. No. 94–0344 P.**

United States District Court, D. Rhode Island.

July 21, 1994.

---

in the City of Warwick who did not vote in the first election but wish to vote in the second election. They brought suit against Joseph R. DiStefano, Jonathan K. Farnum, Louise Mauran, and William Shields ("defendants") in their capacities as members of the Rhode Island Board of Elections ("the Board"), alleging violations of their rights of free speech, association, equal protection, and due process guaranteed by the First and Fourteenth Amendments, and by 42 U.S.C. § 1983 (1988).[1] Plaintiffs seek a judgment declaring that the Board decision to limit the July 19 primary election to those who voted in the June 7 election constitutes a violation of plaintiff class members' constitutional rights. For the reasons set forth below, plaintiffs' request is granted.

I.

The facts in this case are undisputed. The Warwick School Committee consists of five members: two members-at-large and one district member from each of the three school committee election districts into which the City is divided. The members serve four-year terms, with the at-large members elected in the general election in presidential election years, and the district members elected in the general election between Presidential elections. Election of school committee members in Warwick is non-partisan.

A primary election for the Warwick School Committee was held on June 7, 1994. There were four candidates for School Committee District 1, seven candidates for District 2, and four candidates for District 3. Also included on the ballot was a local bond referendum question. Of the 50,252 eligible voters, only 5,913 voters (approximately 12%) actually voted at the June 7 election. Voters at the June 7 primary election were permitted to vote for up to two candidates for school committee offices. After the election, three candidates filed a protest of the election with the Board, alleging that each voter should have been limited to a single vote. On June 14, 1994, the Board issued a decision finding the election to have been in error in allowing

Michael DiBiase, Blish & Cavanagh, Providence, RI, for plaintiffs.

Anthony J. Bucci, Jr., Licht & Semonoff, Providence, RI, for defendants.

### MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

On June 7, 1994, a primary election was held for the Warwick School Committee. The Board of Elections subsequently invalidated that election and scheduled a new election. The new election was restricted to those candidates and voters who had participated in the first election. M. Janice Ayers–Schaffner, Shirley A. Chapian, and Robbin Shackleton ("plaintiffs") are registered voters

1. Plaintiffs also alleged violations of Article I, §§ 2 and 21, and Article II, § 1 of the Rhode Island Constitution, and by Rhode Island General Laws § 17–1–3. In light of my decision on the federal constitutional issues, I need not reach the state law questions.

voters to cast two votes. The Board further held that there was a probability that the election results would have been different had voters been limited to one vote. The Board ordered that a new election and limited that election to those candidates and those voters who participated in the June 7 election. The new election was scheduled for July 19, 1994.

Plaintiffs filed this action to enjoin the Board from holding the July 19 primary and to require the Board to permit all registered voters to vote in the new primary. Plaintiffs originally asked for a preliminary injunction to enjoin the July 19 election. However, after a conference with the court, the Board agreed to stay its decision and postpone the election until early October of 1994. Thus, the request for a preliminary injunction is moot and I shall proceed directly to the merits of the case.

It is important to first note what is *not* being challenged by the plaintiffs. Plaintiffs do not challenge the validity of the Board's decision that the June 7 primary was in error or the decision to call a new election. Nor do plaintiffs question the Board's decision to limit the new primary to the candidates who participated in the June 7 primary. The only issue before this court is the decision of the Board to limit the new primary to those voters who voted in the June 7 primary. With this in mind, I now turn to that issue.

## II.

The importance of the right to vote cannot be understated. "The right to vote is the wellspring from which many other cherished rights flow in our representative democracy." *Devine v. Rhode Island,* 827 F.Supp. 852 (D.R.I.1993). "It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick v. Takushi,* —— U.S. ——, ——, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992) (quoting *Illinois Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979)). Thus, "[i]t has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote." *Griffin v. Burns,* 570 F.2d 1065, 1074

(1st Cir.1978). This right extends to primaries and local elections. *Id.* at 1075.

■ Even though the right to vote is fundamental, every voting regulation is not subject to strict scrutiny. "Election laws will invariably impose some burden upon individual voters. Each provision of a code, 'whether it governs the registration and qualifications of voters,' ... inevitably affects—at least to some degree—the individual's right to vote ..." *Burdick,* —— U.S. at ——, 112 S.Ct. at 2063. Thus, "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* When the right to vote is subjected to "severe" restrictions, the regulation must be "'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed,* 502 U.S. 279, ——, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992)). When the state law imposes only reasonable, nondiscriminatory restrictions upon the rights of voters, "'the State's important regulatory interests are generally sufficient to justify the restrictions.'" *Id.* at ——–——, 112 S.Ct. at 2063–64 (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983)).

■ I must therefore first determine if the restriction on the right to vote in the present case is a "severe" restriction. Defendants argue that there is no burden on plaintiffs' rights. "It is especially difficult to find any burden on the plaintiffs' first amendment rights by the Board's Decision when one considers the easy access provided to the original regularly scheduled election of June 7, 1994." Defs.' Br. at 10. Defendants further argue that "[i]t was the plaintiffs own voluntary choice not to participate and they cannot now complain that their rights have been violated." *Id.* at 9. In support of their argument that was no burden on plaintiffs' rights, defendants cite *Felice v. Rhode Island Bd. of Elections,* 781 F.Supp. 100 (D.R.I. 1991). According to defendants, the court in *Felice* held that "a candidate's rights were not violated by the Board's refusal to certify the candidate for her failure to file a declaration as her name appeared on the voting

list." Defs.' Br. at 3. Before making this finding, the court determined that being a candidate for public office is not a fundamental right and applied the rational relationship test. Because the right at issue in the present case *is* a fundamental right, *Felice* is not on point. It is apparent from defendants' arguments that they have misplaced the focus of the relevant inquiry. The burden placed on the right to vote in the originally scheduled election is immaterial to determine the burden placed on the second election. The question is not whether the first election was open to all but whether the Board may limit the second election.

The relevant focus therefore is on the second election and the relevant question is whether the Board's decision places a severe burden on the plaintiffs' rights. I believe that it is unquestionably so. This case does not involve the more common issues raised in voting rights cases. It does not involve regulations which limit access to ballots, *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (challenging Ohio's early filing deadline for independent presidential candidates), challenges to set aside an election due to irregularities or ballot illegality, *Griffin v. Burns,* 431 F.Supp. 1361 (D.R.I.1977), *aff'd,* 570 F.2d 1065 (1st Cir.1978), nor challenges to the appearance of state ballots, *Devine,* 827 F.Supp. 852. Rather, this case concerns a complete prohibition of the right to vote. By limiting the new primary to those voters who had voted in the June 7 election, the Board disenfranchised almost 90% of the registered voters of Warwick. As plaintiffs aptly state, "the United States Supreme Court has viewed any substantial disqualification of otherwise eligible voters to constitute a severe restriction warranting the highest level of scrutiny." Pltfs.' Br. at 8. *See Hill v. Stone,* 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975) (Texas law requiring bond issue to be approved by majority of persons owning taxable property violated Fourteenth Amendment); *Kramer v. Union Free Sch. Dist. No. 15,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (New York law limiting school

district elections to those owning taxable property or those parents of children enrolled in local public schools violated constitution); *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (poll tax found unconstitutional). Defendants argue that the above cited cases are inapplicable in that those cases involved a "substantial disqualification of otherwise eligible voters in the first and regularly scheduled election." Defs.' Br. at 21–22. However, I have already made clear that the relevant question is whether plaintiffs' right to vote in *any* election has been burdened. In these cases, the Supreme Court applied a high level of scrutiny because a substantial number of voters had been disqualified to vote in an election. The same is the case here. The Board completely denied the right to vote to otherwise registered and qualified voters. A complete denial of the right to vote is a restriction of the severest kind.[2]

Thus, the Board must put forth a compelling state interest for the restrictions. The Board cites seven reasons to support its position:

1) preserving the integrity of the electoral process;

2) enhancing confidence of the electors and election results;

3) recreating the election to fashion a remedy that would generate a valid expression of the will of the voters who participated in the June 7, 1994 originally scheduled election;

4) encourage better voter participation in elections by informing voters that they will only get one opportunity to vote in each election;

5) avoiding the debasement and [dilution] of those votes that were cast in the original election which would occur if the election were not recreated as provided in the Board's Decision;

6) not punishing those voters who took the time and made the effort to participate in

---

2. Defendants argue that plaintiffs' rights are not severely burdened because plaintiffs will have the opportunity to vote in the general election.

Since protection of the right to vote extends to primaries and local elections, *Griffin v. Burns,* 570 F.2d at 1075, this argument is irrelevant.

the original election by diluting their votes; and,

7) avoiding the patent unfairness that could result to those candidates that seemingly prevailed in the original June 7, 1994 primary.

Defs.' Br. at 16–17. I do not believe that the last three reasons can be considered compelling. First, the candidates that "seemingly prevailed" in the original election prevailed in an *invalid* election. The results of a valid election, although different from the original election, will not therefore bring about a patent unfairness. Concern over dilution of the votes from the first election is also misplaced. The first election was invalid. Dilution of the votes is an argument of no merit. Further, concern over the "punishment" of one set of voters cannot override the constitutional rights of another set of voters.

The fourth reason offered by the Board—encouraging better voter participation in elections by informing voters that they will only get one opportunity to vote in each election—is simply nonsensical. On one hand, if the new election is considered a "second" election, then the voters who voted in the originally scheduled election are voting for the second time. On the other hand, if the rescheduled election is considered an entirely new election, then any voter who votes in that election is voting for the first and only time.

I agree wholeheartedly with the Board that the first two reasons offered (preserving the integrity of the electoral process and enhancing the confidence of the electors and election results) are legitimate and compelling state interests. I do not find, however, that the Board's decision is narrowly drawn to serve these interests. First, it is not clear that the limitation on the voters would serve these interests *at all.* The integrity of the electoral process and the confidence of the electors would seem to be served by the occurrence of a valid election in which no constitutional rights are violated. Second, cutting off an entire section of voters from

the electoral process is not a narrow method to encourage these interests.

Defendants also argue that it is against the public interest to allow plaintiffs to vote in the new election.

If more people turn out in the new election than did in the original election, there is a good likelihood that not only will the result be different than the result would have been at the original June 7, 1994 election if the will of the voters was validly expressed, but also that each voter's vote who originally participated will be worth less than it was in the original election.

Defs.' Br. at 19. As I have already pointed out, the originally scheduled election was invalidated by the Board. It cannot therefore be in the public interest to attempt to achieve an identical result. Further, each voter's vote will necessarily be worth less because each voter will be allowed to vote for only one candidate instead of two.

This leaves me with only the third reason to consider: "recreating the election to fashion a remedy that would generate a valid expression of the will of the voters who participated in the June 7, 1994 originally scheduled election." Defs.' Br. at 16.[3] The reconstruction of the original election is a remedy which was approved by the Rhode Island Supreme Court in *Buonanno v. Distefano,* 430 A.2d 765 (R.I.1981). In *Buonanno,* the Board determined that two voting machines malfunctioned during an election for councilperson-at-large. This malfunction resulted in a distorted and incorrect total for one of the candidates. The Board decided to hold a special election and "made clear that it was attempting to reconstruct the voting process as it existed on November 4, 1980." *Id.* at 768. The election was limited to the two polling places where the malfunctioning machines were located. Further, "[t]hose eligible to vote at the special election were those voters who had in fact voted at either polling place on Election Day." *Id.*

---

**3.** An election which would express the will of the voters is indeed a compelling state interest. I do not believe that a determination of the will of the voters should be limited only to those who voted in the June 7 election. To fashion the new election in this way would be tantamount to saying that the new election should express the will of those voting in a previous, invalid election. The new election must express the will of those voting in the new election.

Although the Rhode Island Supreme Court referred to the Board's attempt to reconstruct the election as "ingenious," there is only one other mention by the Court of the restriction on voters. In discussing the practical difficulties involved in staging a new election, the Court stated "[a]t least the new election gave to the voters who had taken the pains to go to the polls a second chance to express their choice about whom they desired to serve in the council at large positions." *Id.* at 771. A single mention of the fact that the election was limited in such a way cannot be considered a thorough constitutional analysis. Thus, although defendants argue otherwise, it is clear from the opinion that the Rhode Island Supreme Court was not presented with the relevant issue.

In discussing the power of the courts to order a new election, the Court cited several opinions from other states. In each of these cases, a new election was ordered. However, in none of these cases did a court limit the election to those voters who had previously voted in the first election. In fact, one of the decisions cited by the *Buonanno* court is an earlier opinion of the Rhode Island Supreme Court which is factually analogous to the present case. *Whitman v. Mott,* 114 R.I. 530, 336 A.2d 836 (1975). In *Whitman,* a new election was ordered because voters were allowed to vote for five of the six candidates when they should have been limited to three votes. In scheduling the new election, the Court specifically ruled "that anyone eligible to vote on the day specified for the special election may cast a ballot for those candidates whom he or she thinks is best qualified to serve." *Id.* 336 A.2d at 841. Unlike *Buonanno,* the *Whitman* court did not say that the second election would be limited to only those voters who voted in the first election. Although *Buonanno* and *Whitman* appear to contradict each other with respect to the eligibility of voters in special elections, the Rhode Island Supreme Court has not discussed this contradiction. Since the *Buonanno* decision did not address the question of the eligibility of voters in the new election, I do not believe it has any precedential value for the case before me. Further, the *Buonanno* decision is inapposite for another reason: it was based on state election law while the present issue concerns federal constitutional rights.

Like *Whitman,* this court, in ordering a special election, has opened that election to all eligible voters. "[E]ach qualified voter will have a full opportunity to cast a ballot, and to have that ballot counted. The Constitution demands no less, and the Court can do no more." *Griffin v. Burns,* 431 F.Supp. at 1369. Thus, I do not believe that the state's interest in reconstructing the election is of such a compelling nature to overcome plaintiffs' constitutional right to vote.

In summary, the Board has offered no narrowly tailored means to achieve a compelling interest which would support the limitation on the voters. It is especially disappointing to guard the right to vote against diminution by the very governmental body entrusted to ensure fair and valid elections. Only fifty-five percent of eligible voters cast ballots in a presidential election. Americans should reconsider this valuable right. We need only look to the citizens of South Africa, who waited for hours to cast their first ballots and danced in the streets upon doing so, to remember the precious values encompassed in the right to vote.

It is therefore Ordered, Adjudged, and Decreed that the defendants be permanently enjoined from limiting the primary election to those voters who voted in the June 7 primary election. Further, defendants are required to permit all duly registered voters to vote in October primary election.

SO ORDERED.