**Lloyd GRIFFIN et al.**

**v.**

**Robert F. BURNS, Secretary of State of the State of Rhode Island, et al.**

Civ. A. No. 77–247.

United States District Court,
D. Rhode Island.

May 17, 1977.

---

10. See note 3, *supra.*

Anthony J. Bucci, Walter R. Stone, Providence, R. I., William Chaika, Cranston, R. I., for plaintiffs.

J. Peter Doherty, Sp. Asst. Atty. Gen., Providence, R. I., for defendants.

Thomas A. McCormick, pro se.

## OPINION AND ORDER

PETTINE, Chief Judge.

Plaintiffs, suing as a class, seek injunctive relief to redress the deprivation by state officials of their constitutionally secured right to vote. This action is brought under 42 U.S.C. § 1983, and jurisdiction is conferred by 28 U.S.C. § 1343(3). Plaintiffs are a duly qualified voter who voted by absentee ballot in the March 29 Democratic primary election in the 10th Ward in Providence; a duly qualified voter who voted by shut-in ballot in that primary; and Lloyd Griffin, a candidate for a vacant seat on the Providence City Council which that election was called to fill. The defendants are Robert F. Burns, the Secretary of State in Rhode Island; the three members of the Providence Board of Canvassers; and Thomas A. McCormick, one of Mr. Griffin's opponents in that March 29 primary.

A temporary restraining order was issued on May 2, 1977, enjoining the defendants from holding the May 3 general election for the 10th ward city council seat. The trial on the merits has been held, consolidated with the hearing on the preliminary injunc-

tion, and the matter is now before the Court for final decision.

## Findings of Fact

After a vacancy occurred in the City Council seat for the 10th ward in Providence, the Providence Board of Canvassers called for an election. Because of the number of candidates for the Democratic Party's nomination, a primary was scheduled for March 29, 1977. Pursuant to a custom reaching back for at least seven years, and in accordance with its understanding of the requirements of state law, see R.I.G.L. § 17-1-2(a) and (g) (1969 reenact.), the Board of Canvassers issued applications to qualified voters to obtain absentee or shut-in ballots.[1] The results of the primary election of March 29 were as follows:

|  | Machine | Absentee | Shut-In | Total |
|---|---|---|---|---|
| Clement | 165 | 0 | 2 | 167 |
| Fayerweather | 86 | 1 | 3 | 90 |
| Griffin | 377 | 34 | 77 | 488 |
| McCormick | 467 | 1 | 5 | 473 |
| Slater | 138 | 0 | 0 | 138 |

While Mr. McCormick carried the machine-only count on March 29 by 90 votes, the Providence Board of Canvassers certified Mr. Griffin the winner by 15 votes when the absentee and shut-in votes finally were counted on April 4. The absentee and shut-in ballots were clearly the key to the election. They comprised slightly more than 10% of the total vote cast.

Mr. McCormick thereupon filed suit in the Rhode Island Supreme Court, challenging inter alia the Board of Canvassers' decision to count any absentee or shut-in ballots on the grounds that state law permitted absentee and shut-in ballots only in general

elections. Mr. Griffin was a party defendant on that action.

On April 27, 1977, the Rhode Island Supreme Court issued a brief order (an opinion is forthcoming), holding that "there is no constitutional or statutory basis for allowing absentee and shut-in voters to cast their votes in a primary election." McCormick v. State Board of Elections, 374 A.2d 116 (R.I.1977). The Board's certification of Mr. Griffin as the party's nominee was therefore quashed. Mr. Griffin filed a motion to re-argue, which was denied in the afternoon of May 2, 1977, and this Court thereupon[2] heard the motion for temporary relief made by Mr. Griffin and two voters who alleged that they had cast absentee and shut-in ballots in reliance on the representations of the Board of Canvassers and Secretary of State. The Court declined to take jurisdiction over any claims of Mr. Griffin, believing that his claims may be raised only by appeal or certiorari to the United States Supreme Court. See 28 U.S.C. § 1257. That decision is here reaffirmed. Relief was, however, granted to the other two named plaintiffs.

At trial, plaintiffs produced four voters from the 10th ward. Three, including one of the named plaintiffs, had cast shut-in votes at the March 29 primary, and it was apparent to the Court that they could indeed not have traveled to the polls "without assistance", the statutory requirement for eligibility for a shut-in ballot. See R.I.G.L. § 17-20-8, 9 (1976 Supp.) Each testified, and the Court so finds, that they would have secured assistance to enable them to vote at the polls in person if they had

---

1. In addition to the Board of Canvassers' issuance of absentee ballots, the Board also published four newspaper notices, pursuant to R.I.G.L. § 17-20-2 (1969 reenact.), advising voters of its readiness to receive applications for absentee and shut-in ballots. Once it received and approved absentee and shut-in applications, the Board forwarded them to the Secretary of State, who performed his duty by certifying the applications and sending the appropriate ballots to the voters. See R.I.G.L. 17-20-4, -6 (1969 reenact.). The ballots were validated at an open hearing of the State Board of Elections, which thereafter returned them to

the Board of Canvassers for opening and tabulation. See R.I.G.L. 17-20-21 (1969 reenact.).

2. Plaintiffs had made an earlier request for temporary relief in this Court on Friday, April 29. However, Judge Day, to whom the motion was addressed in my absence, declined to act because of the pending motion for reargument in the Rhode Island Supreme Court. A request by counsel for plaintiffs here to participate amicus curiae in oral argument of Mr. Griffin's motion to reargue in order to raise the rights of affected voters was denied by the Rhode Island Supreme Court.

known that their shut-in ballots would not have been counted. In other words, but for the representations of defendant state officials, they would have voted in person. They described in detail how the necessary assistance could have been obtained. The Court observes that two of these witnesses, including one of the named plaintiffs, were in wheelchairs—one as a result of multiple sclerosis, another as a result of a break in the spinal cord. The other named plaintiff cast an absentee ballot. She, too, testified, and the Court finds, that but for representation of the defendant officials, she would have altered her arrangements and would have voted in person at the polls.

The defendants produced one shut-in voter who testified that she could not have voted in person even if she had known that her shut-in vote would not have been counted, since she was recovering in the hospital at the time from a Caesarean section.

There is no evidence of any sort that the defendants had any intention to discriminate against Mr. Griffin (who is black) or any of his supporters (including the plaintiffs), or in favor of Mr. McCormick (who is white) or any of his supporters. The voter applications received by the Board of Canvassers and forwarded by the Board to the Secretary of State contained no data which could identify voters by race. Furthermore, the Court finds that defendants acted in good faith in issuing and counting absentee and shut-in ballots. The Court observes by judicial notice that the April 27 decision of the Rhode Island Supreme Court construing state law to forbid these ballots in primary elections caught the state by surprise, and that the legislature acted by May 6, 1977, to pass a law authorizing absentee and shut-in voting in all future primary elections. That new law took effect the day it was signed by the Governor, May 12, 1977.

Nonetheless, the Court must also note certain facts which form the necessary background to understanding the intense interest this case has aroused, and which it would be naive to ignore. The 10th ward, split by Interstate 95, is comprised of two sections—South Providence, a predominantly black neighborhood, and Washington Park, a largely white neighborhood. As was indicated by the arguments made to the Court by Mr. Griffin's counsel (who read portions of *Invisible Man* by Ralph Ellison as his closing argument), many voters in the 10th ward perceive that an election won by their candidate, a black man, was suddenly reversed by a judicial decision holding a long-standing practice of counting absentee and shut-in ballots illegal. The voters of this same ward in November, 1976, elected a black state representative who has been refused his seat in the Rhode Island Legislature and extradited to Michigan. *See generally Bailey v. Laurie,* 373 A.2d 482 (R.I.1977). In short, although there is no evidence of any intentional racial discrimination by defendants in this case, the actions complained of by plaintiffs had an undeniable racial effect on the outcome of the election, an effect observed by the black voters of the 10th ward.

*Conclusions of Law*

◼ A. As a preliminary matter, the state defendants argued orally that this action should not have proceeded without joining, pursuant to Fed.R.Civ.P. 19(a), each of the other candidates in the Democratic primary, any candidates who have qualified for the upcoming general election, all voters who voted in person at the March 29 primary, and the Rhode Island Board of Elections. The motion is denied. The Court has determined that none of the above-named persons is indispensable under Fed.R.Civ.P. 19(b). The voters' interest is, in theory, represented by the state, since both share the common interest of the integrity of the electoral process. In fact, the voters received exemplary representation from the Attorney General, whose effort to consider the public interest the Court recognizes and commends. The Rhode Island Board of Elections has no interest which this Court can discern here. It supplies machines and certifies candidates but has nothing at stake in the outcome. These functions are

no bar and complete relief may be afforded without its participation. Whether or not remaining candidates might be said to be necessary under Rule 19(a) if this case could have taken a leisurely course through this Court, the Court need not decide, although there is grave doubt that their interest, if any, satisfies Rule 19(a). Taking into account the grave nature of the issues at hand, and the crucial importance of quickly resolving public uncertainty created where elections have been postponed, *see e. g., McGill v. Ryals,* 253 F.Supp. 374, 377 (M.D. Ala.) (three-judge court), *appeal dismissed,* 385 U.S. 19, 87 S.Ct. 212, 17 L.Ed.2d 17 (1966); *cf. Maryland Citizens for a Representative General Assembly v. Governor of Maryland,* 429 F.2d 606, 610 (4th Cir. 1970), the Court is certain that the remaining candidates were not indispensible and that the action properly proceeded without them. It should also be noted that none of these candidates, whom the state believes are so interested as to require joinder, made any attempt to intervene in this Court. Indeed, considering that the election seems clearly to have turned into a "two-horse race", their failure to participate is not surprising.

B. Plaintiffs moved orally to certify a class, and the Court granted the motion in open court.

■ The class certified is the class of all those who voted by absentee or shut-in ballot in the March 29, 1977, Democratic primary in the 10th ward in Providence. The class of 123 absentee and shut-in voters is sufficiently numerous as to make joinder impracticable. The class presents common questions of law, *viz.,* whether or not these voters were deprived of their franchise exercise on March 29 by the subsequent action of defendant officials invalidating their ballots. The Court has found adequacy of representation. The class may be certified under Fed.R.Civ.P. 23(b)(2).

■ The state defendants contended vigorously that the requirements of commonality and typicality were not met, that whether or not each member of the class "relied" on the representations of defendants and would have gone in person to the polls but for those representations is a question of fact peculiar to each individual which the Court must individually assess. By this argument, the defendants seek to reduce the class action device to a nullity. Obviously, individual members of any class rarely have precisely the same characteristics and differ in some respects. Class certification is in fact a legal fiction simplifying litigation, and making large-scale dispute resolution possible, by attributing to the members of the class the relevant characteristics of the named plaintiffs. *See Norwalk CORE v. Norwalk Redevelopment Agency,* 395 F.2d 920, 937 (2nd Cir. 1968); *Driver v. Helms,* 74 F.R.D. 382 at 403 (D.R.I.1977); *cf. Lamphere v. Brown University,* 71 F.R.D. 641, 645–48 (D.R.I.1976). Here the relevant factor is that all voters were informed of a right to cast absentee or shut-in ballots in the primary, and that some of those in fact requested and voted those ballots, which were counted and subsequently invalidated. This latter group is a proper class. Because the Court has accepted the uncontradicted testimony of the named members of the class that they would have rearranged their affairs to vote in person if they had known that to be the only way their vote would count, the Court must assume that this is true of all the members of the class except those produced by the defendants who testified otherwise. Not only is this assumption required by Rule 23, in the Court's view, it is required by the very nature of the right to vote:

> The right to vote on an equal basis with other citizens is a fundamental right in a free society; indeed, in any viable form of representative government. It is preservative of all governmental rights. *Yick Wo. v. Hopkins,* 1886, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220, 226. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Harman v. Forssenius,*

1965, 380 U.S. 528, 537, 85 S.Ct. 1177, 1183, 14 L.Ed.2d 50, 57 (poll tax).

*Toney v. White,* 488 F.2d 310, 314 (5th Cir. 1973). *See also Reynolds v. Sims,* 377 U.S. 533, 554–561, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The defendants would have this Court presume that each of the 123 absentee or shut-in voters not called by the plaintiffs to testify would have waived their fundamentally important right to vote for reasons of convenience—a presumption of waiver that the Court cannot, and will not make. *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). *See also Fuentes v. Shevin,* 407 U.S. 67, 94–96 and n. 31, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Ohio Bell Telephone Co. v. Public Utilities Commission,* 301 U.S. 292, 307, 57 S.Ct. 724, 81 L.Ed. 1093 (1937). The presence of two largely paralyzed members of the class in Court to offer testimony under physically and emotionally trying circumstances testifies to the importance class members place on the rights and duties of citizenship.

■ C. Based on the arguments presented at trial, the Court understands the defendants to have conceded the existence of a deprivation of constitutional right by defendants who were acting under color of state law. The Court's attention was directed by the defendants exclusively to the question of the appropriate remedy. In any event, as the Court held in its order of May 2, 1977, there has indeed been a deprivation of constitutional right actionable under 42 U.S.C. § 1983.

■ There is no federal constitutional right to an absentee or shut-in ballot in primary elections. *Fidell v. Board of Elections of City of New York,* 343 F.Supp. 913 (E.D.N.Y.1972) (three-judge court), *aff'd mem.,* 409 U.S. 972, 93 S.Ct. 310, 34 L.Ed.2d 236 (1972). Nevertheless, there is an undoubted right, guaranteed by the constitution, to vote in primary elections on an evenhanded basis together with other qualified voters. *Smith v. Allwright,* 321 U.S. 649, 660–662, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *United States v. Classic,* 313 U.S. 299, 318, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941).

In this case, plaintiffs who attempted in good faith to exercise that right find—through no fault of their own, and in reliance on the representations of state officials—that they have somehow "lost" that right. As the Court noted in its May 2 Order, "something fundamentally unfair has taken place." It is hard to see how this sudden loss of the franchise after it has been exercised by voters unquestionably qualified to exercise it comports either with the right to an undiluted vote, *Reynolds v. Sims,* 377 U.S. 533, 562–68, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Gray v. Sanders,* 372 U.S. 368, 380, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), or with due process of law.

As the Supreme Court said in *Gray v. Sanders,*

> Every voter's vote is entitled to be counted once. It must be correctly counted and reported. As was stated in *United States v. Mosley,* 238 U.S. 383, 386, 35 S.Ct. 904, 905, 59 L.Ed. 1355 "the right to have one's vote counted" has the same dignity as "the right to put a ballot in a box." It can be protected from the diluting effect of illegal ballots.

372 U.S. at 380, 83 S.Ct. at 808. In this case, state officials have in effect presented the plaintiff class with "illegal ballots" and then have refused to count their votes. The right to vote has clearly been infringed. In this context of significant disenfranchisement of an identifiable group at the direction of state officials, the lack of evil intent on the defendants' part is not dispositive. *Toney v. White,* 488 F.2d 310 (5th Cir. 1973); *Coalition for Education, District One v. Board of Elections,* 370 F.Supp. 42 (S.D.N.Y.1974), *aff'd,* 495 F.2d 1090 (2nd Cir. 1974); *Ury v. Santee,* 303 F.Supp. 119 (N.D.Ill.1969).

■ There is no indication that cases explicating the constitutional protections against infringement of the right to an undiluted vote depend in the slightest measure on evil motives of state officials, or only on a finding of racial discrimination. To the contrary, the various types of vote-dilution cases have depended upon effect, not

on intention. *See, e. g., Reynolds v. Sims,* 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Toney v. White,* 488 F.2d 310 (5th Cir. 1973) (en banc); *Coalition for Education in District One,* 370 F.Supp. 42 (S.D. N.Y.1974), aff'd 495 F.2d 1090 (2nd Cir. 1974); *Ury v. Santee,* 303 F.Supp. 119 (N.D. Ill.1969).[3] Those who applied for absentee and shut-in ballots for the March 29 primary fit precisely the situation described by Chief Justice Warren in *Reynolds v. Sims*:

> It could hardly be gainsaid that a constitutional claim had been asserted by an allegation that certain otherwise qualified voters had been entirely prohibited from voting for members of their state legislature.

377 U.S. at 562, 84 S.Ct. at 1382. Plaintiffs here have asserted, and proved, this very claim.

This Court sees no reason to depart from its earlier reliance on *Briscoe v. Kusper,* 435 F.2d 1046 (7th Cir. 1970) to support plaintiffs' due process claim. In *Briscoe,* a number of aldermanic candidates in Chicago relied on a long-standing interpretation of the Board of Election Commissioners in gathering petition signatures. After those signatures had been collected, the Board reversed its policy with the effect of invalidating signatures already collected. The Court noted that the new rule chosen by the Board was a permissible reading of its governing statutes and not unconstitutional, but it found a constitutional deprivation nonetheless.

> Regardless of whether the more restrictive position of the Board was statutorily or constitutionally valid, the application of the new anti-duplication rule to nullify previously acceptable signatures without prior notice was unfair and violated due process. In this instance, the former interpretation of Section 10–3 was

not only reasonable, but it also represented the application of the statute least limiting to political association. An agency may be bound by its own established custom and practice as well as by its formal regulations. The Board may not deviate from such prior rules of decision on the applicability of a fundamental directive without announcing in advance its change in policy. This is especially true where, as here, fundamental, constitutionally protected liberties are adversely affected, and those interested require certain knowledge of what is expected of them by the state. Until such time as the Board makes public its new determination, it is constitutionally prohibited from imposing that rule on unsuspecting persons.

435 F.2d at 1055. *Briscoe* is therefore on all fours in all essential respects with the case at bar, and the Court finds it controlling here.

For the foregoing reasons, the Court concludes that plaintiffs have properly alleged and proved a § 1983 claim.

D. As all parties have recognized, the difficult question in this case is the question of remedy. This is essentially an equitable problem. *Coalition for Education in District One v. Board of Elections, City of New York,* 495 F.2d 1090 (2nd Cir. 1974). *See generally* Starr, Federal Judicial Invalidation as a Remedy for Irregularities In State Elections, 49 N.Y.U.L.Rev. 1092 (1974) (hereinafter *Starr* ); Developments in the Law—Elections, 88 Harv. 1111, 1331–39 (1975) (hereinafter *Harvard* ). The available options seem to be to hold a new election; to validate the March 29 primary by including the absentee and shut-in ballots; or to declare that plaintiffs' rights have been violated but to deny further relief on equitable grounds.

---

**3.** *Hennings v. Grafton,* 523 F.2d 861 (7th Cir. 1975) is not to the contrary. In *Hennings,* the Court denied relief where plaintiffs showed only that some voting machines suffered mechanical breakdowns and that there was a possibility (never proved) that some persons who were allowed thereafter to re-cast ballots may actually have had their machine ballots counted before the mechanical failure. Both the district and appellate courts in *Hennings* seem to have confused the question of whether or not a § 1983 violation was made out with whether or not equitable relief was warranted. *See, e. g., Id.,* at 523 F.2d at 863.

The Court rejects any contention that no relief is justified. Plaintiffs have been deprived of a valuable, and fundamental, right. The Court ought to remedy this loss if it can do so equitably. The defendants did not present, and the Court cannot find, any compelling equitable reasons to deny relief. Plaintiffs have in no sense slept on their rights. By the very nature of the case, they had no opportunity to seek pre-election relief. *See Toney v. White,* 488 F.2d at 313–314 and cases cited therein. Their timely attempt to appear in the Rhode Island Supreme Court met with failure. Nor can this case, involving 10% of the total vote cast, be termed *de minimis.* Additionally, the Court notes that only a single, discrete ward election is involved. *Compare Communist Party v. Whitcomb,* 414 U.S. 441, 94 S.Ct. 656, 38 L.Ed.2d 635 (1974) (violation, but no remedy, in state-wide election.)

The Court has found as a fact that the absentee and shut-in votes determined the outcome of the March 29 primary. This case therefore fits squarely within the category of cases where, because the violation clearly could have altered the outcome, federal courts have been justified in taking the extraordinary step of voiding a state election and ordering a new election. *Toney v. White,* 488 F.2d 310, 313 (5th Cir. 1973) (en banc). *See also Hadnott v. Amos,* 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969); *Hamer v. Campbell,* 358 F.2d 215 (5th Cir. 1966). *See generally Starr,* 1124–27; *Harvard,* 1334–39. The Court finds great merit in the outcome test, which, as one commentator has noted, "disrupts the political process only when the actual results may have been skewed by illegality." *Starr* at 1124.[4]

One approach to making the plaintiffs whole would be simply to validate the original count in the March primary. Although the matter is not free from doubt, it appears that the court might have judicial power to fashion a remedy in disregard of a

perfectly constitutional state statute. *Rader v. Cliburn,* 476 F.2d 182, 184 (6th Cir. 1973). The Rhode Island Supreme Court's decision in *McCormick* is essentially only a construction of a statute. This remedy would simply restore to the plaintiffs, who were qualified to vote, the votes which they cast in reliance on the representation of the defendants. Specific enforcement is a common equitable remedy in reliance cases. *See generally,* 1A Corbin on Contracts §§ 200, 205 (1963).

■ Two factors, however, militate against the remedy of revalidation.

First, there are considerations arising from the previous actions taken by the Rhode Island Supreme Court. That court has quashed the certification and delivery of all absentee and shut-in ballots by the state Board of Elections to the Board of Canvassers, and has quashed the latter's certification of Mr. Griffin as the primary winner. *McCormick v. State Board of Elections,* 368 A.2d 583 (R.I.1977). A revalidation ordered by this Court would therefore subject the Board of Canvassers to inconsistent decrees, and resurrect the very ballots which the Rhode Island Supreme Court has ordered quashed—a disquieting result for a federal court to entertain.

Of greater importance in the Court's view, however, is the primary value which must be attached to the public interest. The electoral processes of this community must work fairly, and must be seen to have worked fairly—and worked by the people. There must not be any lurking suspicion that a court, and not the people, has somehow chosen a primary nominee.

I have therefore determined to order the defendants to conduct another primary election. The state defendants have agreed that this seems to be the proper remedy in this case, and have informed the Court that they consider it a remedy less intrusive into

4. Rhode Island has adopted the outcome test, and the Rhode Island Supreme Court has indicated that state actions which effectively disenfranchise voters and "tend to affect the re-

sults" are grounds for setting aside election results. *See D'Amico v. Mullen,* 351 A.2d 101, 103–4 (R.I.1976) (dictum).

the state's political process than revalidation would be in light of the Rhode Island Supreme Court's decision in *McCormick v. State Board of Elections.* Although a new election cannot replicate the conditions of the March 29 election, each qualified voter will have a full opportunity to cast a ballot, and to have that ballot counted. The Constitution demands no less, and the Court can do no more.

It is therefore Ordered, Adjudged, and Decreed:

1. that this action be certified as a class action, and that final judgment be entered in favor of Mary Morrow, Mary Green, and the class of all those qualified voters who voted by absentee or shut-in ballot in the Democratic party primary in the 10th ward of the City of Providence on March 29, 1977; and

2. that the defendants be permanently enjoined from certifying any person as the Democratic party nominee for the vacant city council seat in the 10th ward of the City of Providence on the basis of the results of the March 29, 1977 primary election, or from holding a general election based on the March 29 primary results; and

3. that the defendants are enjoined to take all necessary steps to hold a new primary for the 10th ward of the City of Providence at the earliest possible date consistent with the requirements of state law; and

4. that the claims of Lloyd Griffin be dismissed.