M. Janice **AYERS–SCHAFFNER,**
et al., Plaintiffs, Appellees,

v.

Joseph R. **DISTEFANO,** et al.,
Defendants, Appellants.

No. 94–1884.

United States Court of Appeals,
First Circuit.

Heard Sept. 16, 1994.

Decided Sept. 30, 1994.

Anthony J. Bucci, Jr., Providence, RI, for appellants.

Michael DiBiase, Providence, RI, for appellees.

Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and KEETON *, District Judge.

COFFIN, Senior Circuit Judge.

This case poses an interesting, and readily answerable, constitutional question: can state election officials restrict the right to vote in a new, curative election to those who participated in the original, defective election? The district court found no state interest served by such a limitation, and rejected it as unconstitutional, 860 F.Supp. 918. We agree, and thus affirm the district court's order directing that the contested new election be open to all registered and qualified voters.[1]

## I. *Factual Background*

On June 7, 1994, a nonpartisan primary election was held for three seats on the Warwick School Committee. Voters were permitted to vote for up to two candidates for the three open positions. After the election, as a result of a protest filed by several of the 15 candidates, the Rhode Island Board of Elections ruled that each voter should have been limited to a single vote. The Board also found that there was a probability that the election results would have been different had the correct procedure been used, and it consequently ordered that a new election be conducted. It further ruled that the new election be limited to those candidates and voters who participated in the original balloting.

This action followed.[2] The plaintiffs are registered voters in the City of Warwick who were eligible to vote in the first election but did not. They wish to be allowed to vote in the second one. They brought suit on behalf of themselves and all similarly situated Warwick residents against the Board of Elections, alleging violations of their rights of free speech, association, equal protection,

and due process as guaranteed by the First and Fourteenth Amendments.[3]

The district court ruled in their favor, finding that no state interest justified the limitation on voters. The Board now appeals, claiming that the district court erred in applying the applicable precedent to the circumstances of this case. The Board claims that its restriction on voters imposes a minimal burden on the plaintiffs while serving legitimate and compelling state interests.

Like the district court, and substantially for the reasons it gave, we conclude that the Board's notion of the applicable constitutional principles is off the mark.

## II. *Discussion*

■ In its simplest form, this case asks us to decide whether a state may condition the right to vote in one election on whether that right was exercised in a preceding election. So stated, the case is hardly worthy of discussion. The right to vote " 'is of the most fundamental significance under our constitutional structure,' " *Burdick v. Takushi*, —— U.S. ——, ——, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992), and depriving a qualified voter of the right to cast a ballot because of failure to vote in an earlier election is almost inconceivable. *See generally Reynolds v. Sims*, 377 U.S. 533, 554–55, 84 S.Ct. 1362, 1377–78, 12 L.Ed.2d 506 (1964) (*quoted in Griffin v. Burns*, 570 F.2d 1065, 1075 (1st Cir.1978) ("[A]ny restrictions on [the right to vote] strike at the heart of representative government."))

■ The Board contends that this case is not that one because the second election here is not a new, independent election, but simply a recreation of the defective primary. It asserts that this distinction renders the right-to-vote caselaw largely inapposite, and that no precedent bars its effort to hold a lawful version of the defective election by restricting participation to the original voters

---

* Of the District of Massachusetts, sitting by designation.

1. We issued an order affirming the district court's judgment immediately after oral argument in this case on September 16, 1994, notifying the parties that an opinion would follow.

2. The curative primary election originally was scheduled for July 19, 1994. After this lawsuit was filed, the Board agreed to reschedule the election to October 4, 1994.

3. Plaintiffs also alleged state causes of action, which we, like the district court, need not reach.

and candidates.[4] The Board maintains that this plan imposes, at most, only a minimal burden on the plaintiffs because of the easy access provided to the regularly scheduled election. And it cites a litany of purposes served by its plan. *See infra* at n. 6.

The Board's effort to distinguish this case is flawed in several respects. First, we cannot accept the Board's suggestion that the second election here is free from the requirements of a genuine election because its purpose is simply to replicate a previous event. The original election was defective and invalid, and the Board deemed its results unreliable. The primary objective of the second election therefore must be viewed as identical to that of the original one, to choose through valid procedures the candidates supported by a majority of the eligible voters. To exclude plaintiffs from the second election is to exclude them from the only primary that will determine the candidates for the school committee offices.

Moreover, the goal of reconstructing the original election is, at best, an illusory one. Presumably, some of the voters who voted the first time will be unable, for various reasons, to participate in the new election. Unexpected trips and illnesses, or even death, may intervene. Some voters no longer may be eligible, having moved from the area. In addition, some undetermined number of voters in the original election voted only for the bond issue that was on the ballot, and some of them could be expected to vote this time for the school committee candi-

dates. An identical match of voters is therefore extremely unlikely.

The second flaw is found in the Board's suggestion that the burden imposed by its action is slight because plaintiffs had ample opportunity to vote in the first election. This is tantamount to a claim that plaintiffs waived their right to vote in the second election by failing to vote in the first. However characterized, the contention is wholly without force.

While it is true that plaintiffs knowingly gave up the only opportunity they expected to have to vote in the primary, they did not thereby waive their interest in the outcome of the election. Nor did they demonstrate any willingness to forego a second chance to vote if circumstances should make a curative election necessary. In the absence of any advance warning that failure to vote in the first election would preclude voting in the second, their lack of participation in the original balloting cannot in any respect be viewed as a waiver of the right to vote in the new primary. And, while access to the first election may have been easily achieved, what is before us is the total denial of the right to vote in the only primary with any significance in the school committee race. That burden is undeniably severe, and it is in no way lessened by the past opportunity to vote in an invalid election.[5]

Third, and most significantly, the Board is unable to articulate any meaningful interest served by its voter restriction. Of the seven separate interests listed in its brief,[6] one is facially meritless,[7] and the remainder all rest

---

4. No challenge has been made to the Board's decision to limit the ballot to those who were candidates in the original primary, and our opinion does not address that issue.

5. Nor is the ability to vote in the general election a satisfactory alternative for those voters not allowed to vote in the primary, as the candidate of their choice may have been excluded in the preliminary election from which they were barred.

6. The seven interests are as follows:
(1) preserving the integrity of the electoral process, (2) enhancing confidence of the electors in election results, (3) recreating the election to fashion a remedy that would generate a valid expression of the will of the voters who participated in the June 7, 1994 originally

scheduled election, (4) encourage better voter participation in elections by informing voters that they will only get one opportunity to vote in each election, (5) avoiding the debasement and disillusion of those votes that were cast in the original election which would occur if the election were not recreated as provided in the Board's Decision, (6) not punishing those voters who took the time and made the effort to participate in the original election by diluting their votes, and (7) avoiding the patent unfairness that could result to those candidates and their supporters that seemingly prevailed in the original June 7, 1994 primary.

7. We share the district court's view that there is no substance in the asserted interest in "encourag[ing] better participation in elections by informing voters that they will only get one oppor-

on the premise that limiting the pool of eligible voters to those who actually voted in the first election is necessary to preserve the integrity of either the original or overall electoral process. As to the original election, it is precisely because the Board found the process to be vulnerable that a new election was scheduled, and any concern for preserving the original votes and outcome is therefore without substance. Indeed, the Board explicitly found "a probability that the order of finish of the[ ] candidates might have been altered" had the correct procedure been followed. Preserving what *would* have been the outcome of the election had it been properly conducted, while a legitimate objective, is, as we have discussed earlier, not feasible in light of the inevitable changes in the availability of the original voters.

With the interest in electoral integrity either inappropriately linked to the original election, or unable to be served as it relates to that election, the only interest in integrity that remains concerns the overall process for choosing school committee candidates. The Board's restriction on voters does not serve this interest.

■ Once the Board wiped the slate clean by nullifying the first election, what needed to be recreated was the "democratic process" surrounding the selection of school committee candidates, not the particular conditions surrounding the original election. *See Griffin*, 570 F.2d at 1079 n. 14 ("The Constitution protects the right of all citizens to democratic processes, not the right of any particular candidate or voters to a certain result.") The foundation of our "democratic process" is the right of all qualified voters to cast their votes effectively. *See, e.g., Burdick*, — U.S. at ——, 112 S.Ct. at 2063; *Anderson v. Celebrezze*, 460 U.S. 780, 787, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547 (1983); *Wesberry v. Sanders*, 376 U.S. 1, 17–18, 84 S.Ct. 526, 534–

35, 11 L.Ed.2d 481 (1964); *Reynolds v. Sims*, 377 U.S. at 554–55, 84 S.Ct. at 1377–78. Depriving eligible voters of the right to vote in the "effective" election shakes that foundation and weakens, rather than supports, the broad goal of preserving the integrity of the electoral process. Indeed, it imposes a penalty for the past failure to vote, precisely the course of action we deemed transparently unconstitutional at the outset of our discussion.

■ The Board's effort to characterize its order as merely a "time, place and manner" restriction blinks reality. The states' authority to regulate elections stems from a recognition, embodied in the Constitution, that elections must be structured carefully to ensure that they are fair and honest, and so that "some sort of order, rather than chaos, is to accompany the democratic processes," *Burdick*, — U.S. at ——, 112 S.Ct. at 2063; (quoting *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974)). This authority, however,

> does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens. The power to regulate the time, place, and manner of elections does not justify, without more, the abridgement of fundamental rights, such as the right to vote....

*Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986) (citing *Wesberry v. Sanders*, 376 U.S. at 6–7, 84 S.Ct. at 529). In this case, the contested order does not implicate the structure of the election, but goes directly to the heart of the voting privilege, denying the privilege to many fully qualified voters.[8]

To put our analysis in traditional right-to-vote terms, *see Burdick*, — U.S. at ——, 112 S.Ct. at 2062,[9] the Board has failed to

---

tunity to vote in each election." We doubt that a voter would decide to vote in an election only to preserve the opportunity to vote in an unlikely-to-occur curative election. Moreover, those who voted in the original election *are* being given another opportunity to vote under the Board's ruling.

8. It is, of course, well established that states may restrict the voting privilege through residency and other registration requirements. The crucial distinction here is that the plaintiffs have satisfied the state's standard voting requirements.

9. Quoting from *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570, and *Tashjian*, 479 U.S. at 213–14,

offer even a rational basis for its direct, retroactive limitation on the right to vote. In light of the obviously severe nature of the injury to the plaintiffs, who would be denied the right to participate in the selection of school committee candidates, the restriction cannot be permitted.

Although the Board cites numerous cases in support of its position, none involves an equivalent action. The long line of cases upholding ballot access requirements are patently inapplicable, as limiting candidates through reasonable advance requirements provides no justification for the retroactive restriction of the right to vote. *See, e.g., Munro v. Socialist Workers Party,* 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) (requirements for placement of minority party candidates on ballot); *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (requirements of party disaffiliation and no voting in preceding primary for access to ballot as independent); *Felice v. Rhode Island Board of Elections,* 781 F.Supp. 100 (D.R.I.1991) (candidate must file declaration precisely as name appeared on voting list).[10] The right-to-vote cases also involve conditions explicitly established *in advance* as prerequisites for voting, *see, e.g., Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (upholding advance

party affiliation requirement for party primary); *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (upholding bona fide residence requirements, but rejecting one-year durational requirement). The Board points to no federal case in which a segment of the electorate, qualified to vote under state and local law, is barred from participating in an election based on the failure to meet some later-imposed, additional criteria.

The Board's most apposite precedent is a Rhode Island Supreme Court case, *Buonanno v. DiStefano,* 430 A.2d 765 (R.I.1981), in which the state Board of Elections ordered a special election limited to two polling places where voting machines had malfunctioned during the regular election. Only those voters who had voted at those two polling places were eligible to vote in the special election.

The Supreme Court upheld the Board's order, describing as "ingenious" the Board's attempt to reconstruct the election. *Id.* at 771. As the district court in this case noted, however, the Supreme Court made only scant reference to the portion of the Board's decision limiting the special election to those who previously had voted,[11] and, in fact, it appears likely that the petitioner did not challenge that aspect of the Board's ruling.

107 S.Ct. at 547–48, the Supreme Court in *Burdick* formulated the standard as follows:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

> Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." ... But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

10. The Board claims that these cases are relevant in light of the Supreme Court's statement that " 'the rights of voters and the rights of candidates do not lend themselves to neat separation,' " *Burdick,* —— U.S. at ——, 112 S.Ct. at 2065–66 (quoting *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972)). The issue in *Burdick* was whether a state could bar write-in voting. The petitioner was a voter. The Court noted the close link between voters' and candidates' rights in the course of rejecting the suggestion that the challenge to the law was more potent because framed as a right-to-vote rather than a ballot access case.

11. The court recognized that practical difficulties concerning voter turnout are involved in holding a new election, but noted that "[a]t least the new election gave to the voters who had taken the pains to go to the polls a second chance to express their choice about whom they desired to serve in the council at-large positions." *Id.* at 771. The court then stated that "[t]he practical difficulties are far outweighed by the value served by this remedy." *Id.*

In addition, the Board in *Buonanno* did not "clean the slate" by invalidating the whole election, but called for reconstruction of only a portion of the voting. We need not decide here whether the breadth of the voting limitation is significant; for our purposes, it is enough to say that a case upholding a voting restriction in such a limited context and without constitutional analysis is of doubtful support when an entire election has been invalidated.

Indeed, an earlier Rhode Island case more factually analogous to the present case suggests that the state's high court views full voter participation as the appropriate procedure when a completely new election is held. In *Whitman v. Mott*, 114 R.I. 530, 336 A.2d 836 (R.I.1975), cited in *Buonanno*, the court invalidated a town council election because voters were allowed to vote for five of the six candidates when they should have been limited to three votes. The Court scheduled a new election limited to the six original candidates, but expressly ruled "that anyone eligible to vote on the day specified for the special election may cast a ballot for those candidates whom he or she thinks is best qualified to serve." 114 R.I. at 539, 336 A.2d at 841. *See also Griffin v. Burns*, 431 F.Supp. 1361 (D.R.I.1977), *aff'd*, 570 F.2d 1065 (1st Cir.1978).[12]

It bears repeating that "[t]he right to vote is one of the most important and cherished constitutional rights," *Leaks v. Board of Elections of the City of New York*, 58 N.Y.2d 882, 883, 447 N.E.2d 42, 43, 460 N.Y.S.2d 494, 495 (1983). In a fresh election designed to determine which candidates are supported by a majority of the properly registered voters, we cannot conceive of a governmental interest sufficiently strong to limit the right to vote to only a portion of the qualified elector-

ate. In this case, at least, where such an interest has not been articulated, we conclude that present voting status is the only appropriate yardstick for eligibility. *See id.*[13]

*The judgment of the district court is therefore AFFIRMED.*

---

12. In *Griffin*, the district court found that the invalidation of absentee and shut-in ballots in a party primary for a Providence city council seat was unconstitutional. In ordering a new election open to all qualified voters, the court stated:

> Although a new election cannot replicate the conditions of the March 29 election, each qualified voter will have a full opportunity to cast a ballot, and to have that ballot counted. The Constitution demands no less, and the Court can do no more.

431 F.Supp. at 1369. In affirming, we observed that "a new primary ... had the virtue of giving the voters a further chance, in a fair election, to express their views." 570 F.2d at 1079.

13. *Leaks* also involved a primary election that was invalidated. The election board had ordered a new election limited only to those voters *eligible* to participate in the first election. The Court of Appeals reversed in a brief memorandum decision, ordering that all voters eligible at the time of the special election be allowed to vote.