UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 94-1884

 M. JANICE AYERS-SCHAFFNER, ET AL.,

 Plaintiffs, Appellees,

 v.

 JOSEPH R. DISTEFANO, ET AL.,

 Defendants, Appellants.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Raymond J. Pettine, Senior U.S. District Judge]
 

 

 Before

 Torruella, Chief Judge,
 
 Coffin, Senior Circuit Judge,
 
 and Keeton*, District Judge. 
 

 

 Anthony J. Bucci, Jr., for appellants.
 
 Michael DiBiase for appellees.
 

 

 September 30, 1994
 

 

*Of the District of Massachusetts, sitting by designation.

 COFFIN, Senior Circuit Judge. This case poses an
 

interesting, and readily answerable, constitutional question: can

state election officials restrict the right to vote in a new,

curative election to those who participated in the original,

defective election? The district court found no state interest

served by such a limitation, and rejected it as unconstitutional.

We agree, and thus affirm the district court's order directing

that the contested new election be open to all registered and

qualified voters.1

 I. Factual Background
 

 On June 7, 1994, a nonpartisan primary election was held for

three seats on the Warwick School Committee. Voters were

permitted to vote for up to two candidates for the three open

positions. After the election, as a result of a protest filed by

several of the 15 candidates, the Rhode Island Board of Elections

ruled that each voter should have been limited to a single vote.

The Board also found that there was a probability that the

election results would have been different had the correct

procedure been used, and it consequently ordered that a new

election be conducted. It further ruled that the new election be

limited to those candidates and voters who participated in the

original balloting.

 

 1 We issued an order affirming the district court's judgment
immediately after oral argument in this case on September 16,
1994, notifying the parties that an opinion would follow.

 -2-

 This action followed.2 The plaintiffs are registered

voters in the City of Warwick who were eligible to vote in the

first election but did not. They wish to be allowed to vote in

the second one. They brought suit on behalf of themselves and

all similarly situated Warwick residents against the Board of

Elections, alleging violations of their rights of free speech,

association, equal protection, and due process as guaranteed by

the First and Fourteenth Amendments.3

 The district court ruled in their favor, finding that no

state interest justified the limitation on voters. The Board now

appeals, claiming that the district court erred in applying the

applicable precedent to the circumstances of this case. The

Board claims that its restriction on voters imposes a minimal

burden on the plaintiffs while serving legitimate and compelling

state interests.

 Like the district court, and substantially for the reasons

it gave, we conclude that the Board's notion of the applicable

constitutional principles is off the mark.

 II. Discussion
 

 In its simplest form, this case asks us to decide whether a

state may condition the right to vote in one election on whether

that right was exercised in a preceding election. So stated, the

 

 2 The curative primary election originally was scheduled for
July 19, 1994. After this lawsuit was filed, the Board agreed to
reschedule the election to October 4, 1994.

 3 Plaintiffs also alleged state causes of action, which we,
like the district court, need not reach.

 -3-

case is hardly worthy of discussion. The right to vote "`is of

the most fundamental significance under our constitutional

structure,'" Burdick v. Takushi, 112 S. Ct. 2059, 2063 (1992),
 

and depriving a qualified voter of the right to cast a ballot

because of failure to vote in an earlier election is almost

inconceivable. See generally Reynolds v. Sims, 377 U.S. 533,
 

554-55 (1964) (quoted in Griffin v. Burns, 570 F.2d 1065, 1075
 

(1st Cir. 1978) ("[A]ny restrictions on [the right to vote]

strike at the heart of representative government.")

 The Board contends that this case is not that one because

the second election here is not a new, independent election, but

simply a recreation of the defective primary. It asserts that

this distinction renders the right-to-vote caselaw largely

inapposite, and that no precedent bars its effort to hold a

lawful version of the defective election by restricting

participation to the original voters and candidates.4 The Board

maintains that this plan imposes, at most, only a minimal burden

on the plaintiffs because of the easy access provided to the

regularly scheduled election. And it cites a litany of purposes

served by its plan. See infra at n.6.
 

 The Board's effort to distinguish this case is flawed in

several respects. First, we cannot accept the Board's suggestion

that the second election here is free from the requirements of a

genuine election because its purpose is simply to replicate a

 

 4 No challenge has been made to the Board's decision to
limit the ballot to those who were candidates in the original
primary, and our opinion does not address that issue.

 -4-

previous event. The original election was defective and invalid,

and the Board deemed its results unreliable. The primary

objective of the second election therefore must be viewed as

identical to that of the original one, to choose through valid

procedures the candidates supported by a majority of the eligible

voters. To exclude plaintiffs from the second election is to

exclude them from the only primary that will determine the

candidates for the school committee offices.

 Moreover, the goal of reconstructing the original election

is, at best, an illusory one. Presumably, some of the voters who

voted the first time will be unable, for various reasons, to

participate in the new election. Unexpected trips and illnesses,

or even death, may intervene. Some voters no longer may be

eligible, having moved from the area. In addition, some

undetermined number of voters in the original election voted only

for the bond issue that was on the ballot, and some of them could

be expected to vote this time for the school committee

candidates. An identical match of voters is therefore extremely

unlikely.

 The second flaw is found in the Board's suggestion that the

burden imposed by its action is slight because plaintiffs had

ample opportunity to vote in the first election. This is

tantamount to a claim that plaintiffs waived their right to vote

in the second election by failing to vote in the first. However

characterized, the contention is wholly without force.

 -5-

 While it is true that plaintiffs knowingly gave up the only

opportunity they expected to have to vote in the primary, they

did not thereby waive their interest in the outcome of the

election. Nor did they demonstrate any willingness to forego a

second chance to vote if circumstances should make a curative

election necessary. In the absence of any advance warning that

failure to vote in the first election would preclude voting in

the second, their lack of participation in the original balloting

cannot in any respect be viewed as a waiver of the right to vote

in the new primary. And, while access to the first election may

have been easily achieved, what is before us is the total denial

of the right to vote in the only primary with any significance in

the school committee race. That burden is undeniably severe, and

it is in no way lessened by the past opportunity to vote in an

invalid election.5

 Third, and most significantly, the Board is unable to

articulate any meaningful interest served by its voter

restriction. Of the seven separate interests listed in its

brief,6 one is facially meritless,7 and the remainder all rest

 

 5 Nor is the ability to vote in the general election a
satisfactory alternative for those voters not allowed to vote in
the primary, as the candidate of their choice may have been
excludedin the preliminary election from which they were barred. 

 6 The seven interests are as follows:

 (1) preserving the integrity of the electoral process,
 (2) enhancing confidence of the electors in election
 results, (3) recreating the election to fashion a
 remedy that would generate a valid expression of the
 will of the voters who participated in the June 7, 1994
 originally scheduled election, (4) encourage better

 -6-

on the premise that limiting the pool of eligible voters to those

who actually voted in the first election is necessary to preserve

the integrity of either the original or overall electoral

process. As to the original election, it is precisely because

the Board found the process to be vulnerable that a new election

was scheduled, and any concern for preserving the original votes

and outcome is therefore without substance. Indeed, the Board

explicitly found "a probability that the order of finish of the[]

candidates might have been altered" had the correct procedure

been followed. Preserving what would have been the outcome of
 

the election had it been properly conducted, while a legitimate

objective, is, as we have discussed earlier, not feasible in

light of the inevitable changes in the availability of the

original voters.

 

 voter participation in elections by informing voters
 that they will only get one opportunity to vote in each
 election, (5) avoiding the debasement and disillusion
 of those votes that were cast in the original election
 which would occur if the election were not recreated as
 provided in the Board's Decision, (6) not punishing
 those voters who took the time and made the effort to
 participate in the original election by diluting their
 votes, and (7) avoiding the patent unfairness that
 could result to those candidates and their supporters
 that seemingly prevailed in the original June 7, 1994
 primary.

 7 We share the district court's view that there is no
substance in the asserted interest in "encourag[ing] better
participation in elections by informing voters that they will
only get one opportunity to vote in each election." We doubt
that a voter would decide to vote in an election only to preserve
the opportunity to vote in an unlikely-to-occur curative
election. Moreover, those who voted in the original election are
 
being given another opportunity to vote under the Board's ruling.

 -7-

 With the interest in electoral integrity either

inappropriately linked to the original election, or unable to be

served as it relates to that election, the only interest in

integrity that remains concerns the overall process for choosing

school committee candidates. The Board's restriction on voters

does not serve this interest.

 Once the Board wiped the slate clean by nullifying the first

election, what needed to be recreated was the "democratic

process" surrounding the selection of school committee

candidates, not the particular conditions surrounding the

original election. See Griffin, 570 F.2d at 1079 n.14 ("The
 

Constitution protects the right of all citizens to democratic

processes, not the right of any particular candidate or voters to

a certain result.") The foundation of our "democratic process"

is the right of all qualified voters to cast their votes

effectively. See, e.g., Burdick, 112 S. Ct. at 2063; Anderson v.
 

Celebrezze, 460 U.S. 780, 787 (1983); Wesberry v. Sanders, 376
 

U.S. 1, 17-18 (1964); Reynolds v. Sims, 377 U.S. at 554-55.
 

Depriving eligible voters of the right to vote in the "effective"

election shakes that foundation and weakens, rather than

supports, the broad goal of preserving the integrity of the

electoral process. Indeed, it imposes a penalty for the past

failure to vote, precisely the course of action we deemed

transparently unconstitutional at the outset of our discussion.

 The Board's effort to characterize its order as merely a

"time, place and manner" restriction blinks reality. The states'

 -8-

authority to regulate elections stems from a recognition,

embodied in the Constitution, that elections must be structured

carefully to ensure that they are fair and honest, and so that

"some sort of order, rather than chaos, is to accompany the

democratic processes," Burdick, 112 S. Ct. at 2063 (quoting
 

Storer v.Brown, 415 U.S.724, 730 (1974)). Thisauthority, however,
 

 does not extinguish the State's responsibility to
 observe the limits established by the First Amendment
 rights of the State's citizens. The power to regulate
 the time, place, and manner of elections does not
 justify, without more, the abridgement of fundamental
 rights, such as the right to vote . . . .

Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 217
 

(1986) (citing Wesberry v. Sanders, 376 U.S. at 6-7). In this
 

case, the contested order does not implicate the structure of the

election, but goes directly to the heart of the voting privilege,

denying the privilege to many fully qualified voters.8

 To put our analysis in traditional right-to-vote terms, see
 

Burdick, 112 S. Ct. at 2062,9 the Board has failed to offer even
 

 

 8 It is, of course, well established that states may
restrict the voting privilege through residency and other
registration requirements. The crucial distinction here is that
the plaintiffs have satisfied the state's standard voting
requirements. 

 9 Quoting from Anderson, 460 U.S. at 789, and Tashjian, 479
 
U.S. at 213-214, the Supreme Court in Burdick formulated the
 
standard as follows:

 A court considering a challenge to a state election law
 must weigh "the character and magnitude of the asserted
 injury to the rights protected by the First and
 Fourteenth Amendments that the plaintiff seeks to
 vindicate" against "the precise interests put forward
 by the State as justifications for the burden imposed
 by its rule," taking into consideration "the extent to
 which those interests make it necessary to burden the

 -9-

a rational basis for its direct, retroactive limitation on the

right to vote. In light of the obviously severe nature of the

injury to the plaintiffs, who would be denied the right to

participate in the selection of school committee candidates, the

restriction cannot be permitted.

 Although the Board cites numerous cases in support of its

position, none involves an equivalent action. The long line of

cases upholding ballot access requirements are patently

inapplicable, as limiting candidates through reasonable advance

requirements provides no justification for the retroactive

restriction of the right to vote. See, e.g., Munro v. Socialist
 

Workers Party, 479 U.S. 189 (1986) (requirements for placement of
 

minority party candidates on ballot); Storer v. Brown, 415 U.S.
 

724 (1974) (requirements of party disaffiliation and no voting in

preceding primary for access to ballot as independent); Felice v.
 

Rhode Island Board of Elections, 781 F. Supp. 100 (D.R.I. 1991)
 

(candidate must file declaration precisely as name appeared on

 

 plaintiff's rights."

 Under this standard, the rigorousness of our
 inquiry into the propriety of a state election law
 depends upon the extent to which a challenged
 regulation burdens First and Fourteenth Amendment
 rights. Thus, as we have recognized when those rights
 are subjected to "severe" restrictions, the regulation
 must be "narrowly drawn to advance a state interest of
 compelling importance." . . . But when a state election
 law provision imposes only "reasonable,
 nondiscriminatory restrictions" upon the First and
 Fourteenth Amendment rights of voters, "the State's
 important regulatory interests are generally sufficient
 to justify" the restrictions.

 -10-

voting list).10 The right-to-vote cases also involve

conditions explicitly established in advance as prerequisites for
 

voting, see, e.g., Rosario v. Rockefeller, 410 U.S. 752 (1973)
 

(upholding advance party affiliation requirement for party

primary); Dunn v. Blumstein, 405 U.S. 330 (1972) (upholding bona
 

fide residence requirements, but rejecting one-year durational

requirement). The Board points to no federal case in which a

segment of the electorate, qualified to vote under state and

local law, is barred from participating in an election based on

the failure to meet some later-imposed, additional criteria.

 The Board's most apposite precedent is a Rhode Island

Supreme Court case, Buonanno v. DiStefano, 430 A.2d 765 (R.I.
 

1981), in which the state Board of Elections ordered a special

election limited to two polling places where voting machines had

malfunctioned during the regular election. Only those voters who

had voted at those two polling places were eligible to vote in

the special election.

 The Supreme Court upheld the Board's order, describing as

"ingenious" the Board's attempt to reconstruct the election. Id.
 

at 771. As the district court in this case noted, however, the

 

 10 The Board claims that these cases are relevant in light
of the Supreme Court's statement that "`the rights of voters and
the rights of candidates do not lend themselves to neat
separation,'" Burdick, 112 S. Ct. at 2065-66 (quoting Bullock v.
 
Carter, 405 U.S. 134, 143 (1972)). The issue in Burdick was
 
whether a state could bar write-in voting. The petitioner was a
voter. The Court noted the close link between voters' and
candidates' rights in the course of rejecting the suggestion that
the challenge to the law was more potent because framed as a
right-to-vote rather than a ballot access case.

 -11-

Supreme Court made only scant reference to the portion of the

Board's decision limiting the special election to those who

previously had voted,11 and, in fact, it appears likely that

the petitioner did not challenge that aspect of the Board's

ruling. In addition, the Board in Buonanno did not "clean the
 

slate" by invalidating the whole election, but called for

reconstruction of only a portion of the voting. We need not

decide here whether the breadth of the voting limitation is

significant; for our purposes, it is enough to say that a case

upholding a voting restriction in such a limited context and

without constitutional analysis is of doubtful support when an

entire election has been invalidated.

 Indeed, an earlier Rhode Island case more factually

analogous to the present case suggests that the state's high

court views full voter participation as the appropriate procedure

when a completely new election is held. In Whitman v. Mott, 114
 

R.I. 530, 336 A.2d 836 (R.I. 1975), cited in Buonanno, the court
 

invalidated a town council election because voters were allowed

to vote for five of the six candidates when they should have been

limited to three votes. The Court scheduled a new election

limited to the six original candidates, but expressly ruled "that

 

 11 The court recognized that practical difficulties
concerning voter turnout are involved in holding a new election,
but noted that "[a]t least the new election gave to the voters
who had taken the pains to go to the polls a second chance to
express their choice about whom they desired to serve in the
council at-large positions." Id. at 771. The court then stated
 
that "[t]he practical difficulties are far outweighed by the
value served by this remedy." Id.
 

 -12-

anyone eligible to vote on the day specified for the special

election may cast a ballot for those candidates whom he or she

thinks is best qualified to serve." 114 R.I. at 539, 336 A.2d at

841. See also Griffin v. Burns, 431 F. Supp. 1361 (D.R.I. 1977),
 

aff'd, 570 F.2d 1065 (1st Cir. 1978).12
 

 It bears repeating that "[t]he right to vote is one of the

most important and cherished constitutional rights," Leaks v.
 

Board of Elections of the City of New York, 58 N.Y.2d 882, 883,
 

447 N.E.2d 42, 43, 460 N.Y.S.2d 494, 495 (1983). In a fresh

election designed to determine which candidates are supported by

a majority of the properly registered voters, we cannot conceive

of a governmental interest sufficiently strong to limit the right

to vote to only a portion of the qualified electorate. In this

case, at least, where such an interest has not been articulated,

 

 12 In Griffin, the district court found that the
 
invalidation of absentee and shut-in ballots in a party primary
for a Providence city council seat was unconstitutional. In
ordering a new election open to all qualified voters, the court
stated:

 Although a new election cannot replicate the conditions
 of the March 29 election, each qualified voter will
 have a full opportunity to cast a ballot, and to have
 that ballot counted. The Constitution demands no less,
 and the Court can do no more.

431 F. Supp. at 1369. In affirming, we observed that "a new
primary . . . had the virtue of giving the voters a further
chance, in a fair election, to express their views." 570 F.2d at
1079.

 -13-

we conclude that present voting status is the only appropriate

yardstick for eligibility. See id.13

 

 The judgment of the district court is therefore AFFIRMED.
 

 

 13 Leaks also involved a primary election that was
 
invalidated. The election board had ordered a new election
limited only to those voters eligible to participate in the first
 
election. The Court of Appeals reversed in a brief memorandum
decision, ordering that all voters eligible at the time of the
special election be allowed to vote.

 -14-